Good morning, Your Honors. May it please the Court, my name is Robert Greene. I'm appearing for the Plaintiffs. I am splitting my time with counsel ten minutes each and I'll reserve three minutes for rebuttals. That leaves me with seven. I'm going to address the federal claims, the FCA claims through the Billing Act and Mr. Johnson will address the state law based claims. I was looking at something else and I missed it. Do you want the clerk to divide the time? If you could set seven, that would be helpful. Thank you, Your Honor. It's argued that the authorities cited in our briefs and the cases, the Supreme Court case of Reeder and the Ninth Circuit decision of Davel, which came down about two months ago, mandate a reversal of the federal claims and that you can bring a claim for violation of 201 in the federal court in the first instance and the district court's decision to the then for this court on the federal claims is whether there is any issue of primary jurisdiction left in the case that could then be decided by the district court. The question asked in Davel is, that being the case, the dismissal was inappropriate, can the case proceed in this court under the primary jurisdiction theory? And I would submit that in this case, the factors that apply to the primary jurisdiction theory would support a ruling by this court that any referral to the FCC or any dismissal without prejudice for the purpose of going to the FCC would be improper and that this court has before it what it needs to make that decision at this point in time. The bottom line is that with the consent decree before the FCC where it considered 900 complaints, similar to the complaint at Barr, it completed its investigation and process on that issue and in exchange for a million dollars from the defendant in this case, determined that it would not prosecute those claims any further and that it would not, as it normally does not, apply any damages to any person aggrieved in these circumstances. Does the FCC ordinarily take up claims of false advertising? That's a good question, Your Honor. It's rare and there is a dissent in this case by the FCC about the false advertising issues and it's our view that the interplay between false advertising and the tariff in particular makes us unsuited for primary jurisdiction. But the FCC does address, if I understood your answer, you didn't answer no. You said it was unusual or rare. So the FCC evidently does address questions of false advertising. Is that correct? Well, I think they did in this case. Does the FCC have any ability to be able to award damages to individual complainants? Not that I'm aware of and as far as I read the decision of their consent decree in this case, they've decided not to do so in this case. Are you suggesting there's no federal jurisdiction? I'm suggesting there is federal jurisdiction in the district court under 207 and that the advertising component in particular, along with the other reasons I've given, make a referral back to the FCC for any determination, particularly inappropriate in this case. And given that we've spent our time with cases that have been filed in 2000 to now 2006, that any delay in that process would severely prejudice plaintiffs. Am I correct in thinking or incorrect in, I mean that as a real question because I don't know much about this area of law, am I correct in thinking that if the FCC wanted to, it could publish regs controlling how telephone companies advertise, the FCC can and does deal with problems it perceives and how tariffs are administered by the phone companies in consent decrees. And if the FCC thinks there's fraud going on in the way telephone companies are selling their services, it has the power to do whatever needs to be done to remedy that fraud. I believe that's a correct statement of law. I have not researched that to the end. In this case, the FCC did undertake to do that in the notice of apparent liability which it filed and then in the consent decree determined that it would not pursue that issue in this case. And so whatever its powers might be in that world, we have a definite decision that in this case, after looking at 900 complaints, it is not going to exercise that jurisdiction and there is some question about whether it should in any sense. Tell me if I've got this right. The case is so big and complicated that I'm not confident. Basically the company here did not exactly violate its tariff in the plaintiff's view. Rather, what the company did was publish a tariff that's totally incomprehensible so that people get sold a bill of goods, persuaded to switch phone companies without knowing what they're getting into, and then they get hammered with much bigger bills than they could reasonably expect. That is the essence of the plaintiff's claim at this stage, although I would say there are some allegations in the complaints that assert that they have not properly applied the tariff. So for the purpose of this record, the question of whether the tariff was properly applied is also before the court. I would tell you, however, that given the difficulty of following their tariff, I cannot stand here and say with confidence that I could properly calculate today what an amount is. I think it's practically impossible. But to the extent they did charge, that allegation is in the complaint and it is in the case. I'm thinking what a clearly solid class action would be is if the tariff says four cents a minute and the company's been billing people for six cents a minute, and it's not an issue of rounding up like in Marcus or something of that nature. It's just programming their computers to bill at a different rate from what the tariff says. That would be a good class action. Is that right? Yes, yes it would. And in this case... Would you agree in federal court? Yes. Why wouldn't the FCC have jurisdiction over that if you were not abiding by your tariff? Because you have authority to, a person has authority to enforce a tariff in federal court. That's unchallenged by the defendants. The security services case we cite in our brief was exactly that. The defendants agree that you can't enforce, that's always been the that a tariff provision is invalid in federal court as well because section 207 doesn't distinguish between enforcing a tariff and declaring invalid. The effect in this case would be to have the same type of case that you suggest because if the tariff is determined to be invalid, then the charges were not according to a valid tariff. So we would end up in the same situation. That's just like people suing moving companies or railroads or any other carrier for, and there is a private cause of action for damages. Yes. Counselor, did you have any remedy with the FTC for false advertising? We did not pursue that. I did not know the answer, Your Honor. Do you know whether the FTC would have jurisdiction to do this? I do not know. I'll leave the time to my counsel. I think second counsel has asked for ten minutes. Is that correct? I'm going to go ahead with seven on my part as well, reserve three like my co-counsel did. Good morning. My name is Daniel Johnson, and I'm here for the plaintiffs as well to argue the issues concerning plaintiff state law causes of action. My client is Sound Travel, Inc., and Sound Travel brought a single claim against the defendants in this case for Help me with what these claims are. I couldn't, when I tried to figure out what the state law claims are, I thought, well, in the abstract, there certainly could be state law claims that weren't preempted because the federal statute doesn't have broad preemption language like the ERISA statute. But I couldn't figure out what they were in this case other than rephrasing of the tariff is incomprehensible and we were tricked into switching carriers. No, that's not quite right, Your Honor. The claim that we bring under state law is that the defendants use deceitful advertising and marketing practices to lure us into switching carriers and purchasing their services instead of staying with the carrier we have. I think that's a slightly less colloquially phrased version of exactly what I said. If it isn't, tell me what the difference is. Well, maybe I missed what you said. Here's my problem. People theoretically have knowledge of the tariff. They're charged with knowledge of the tariff. So if somebody says, we're going to do all these wonderful things for you, and the tariff says, here's what we're going to do for you, and it doesn't list those wonderful things, tough. They can't reasonably have relied because supposedly they know what's in the tariff. And I'm trying to figure out how the state law claims are any different. Well, the state law claims are different because we're not seeking, we're not challenging anything in the tariff. We're not claiming that there was anything unreasonable about the tariff terms. We're not claiming that the tariff was that they couldn't charge us what they charged us. What we're claiming is that they misled us about what we were going to get. Is that a fraud in the inducement claim? Is that what this is? Yeah, I think that's right. And I handed up the savings clause in the FCA, which I think the clerk provided to each of your honors. Section 414 of the FCA, it's a single piece of paper, and it reads, nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute. And that savings clause has to preserve something under state law. It's here. It doesn't really say. What happens in a case? Suppose the tariff says six cents a minute, and it's plain as day, and the company puts ads on local TV four cents a minute, just a flat-out lie. Is the state law remedy for fraud preserved, or is it defeated because people are charged with knowledge of the tariff? Well, the way the courts have come down on this question is that, you know, clearly if somebody is trying to enforce the promise that was made inconsistent with the tariff, that's a challenge to the tariff. And that arises under federal law, creates federal question jurisdiction, and is preempted by federal law. But if somebody is arguing, is claiming that they were- My hypothetical is to suit for damages for the two-cent difference. Right. And that is clearly preempted. And it also clearly creates federal jurisdiction. But when a consumer claims that they were misled- Wait a minute. I guess you and I are not communicating here. My hypothetical, the ad said four cents, the tariff says six cents. That's state fraud action for the two cents multiplied by all the millions of minutes. And you're saying that's preempted- Right. And it gets dismissed. Right. Under central office and the other circuit court cases that the parties have cited. But the difference here is that, I mean, when you're seeking damages under, when you're stating a state law claim against a carrier, the only reason why that might implicate federal preemption and federal jurisdiction is because you're actually challenging a tariff term. And where you don't directly challenge the tariff term, that is you're not saying that-  Our measure of damages is put us back where we were. It's essentially like a rescission of contract. And that means doing what? That means the way we've articulated it is that, and it's undisputed, it was agreed to by the defendants and by the court, was that the rates we were paying our previous carrier would be, we would be restored to those rates by virtue of the damage award. So the damages would cause a change in the rate. No, you know, that is not the case. And it's a very fine distinction. It's a fine distinction that apparently the Seventh Circuit wasn't convinced by. Actually, the Seventh Circuit has been convinced. In Kahneman? In Kahneman. The Seventh Circuit actually directly addressed this issue of, well, what is this savings clause? If the savings clause doesn't mean that you can challenge the terms of a tariff or, you know, mount a breach of contract claim, like in that case, where you're saying you promised me one thing, now your tariff says another. If you can't do that, then what can you do? And what the Seventh Circuit said, the proper operation of the savings clause is demonstrated in the Sixth Circuit's decision in in-ray long-distance telephone litigation. And in that case, you have a nondisclosure claim, what the Seventh Circuit called simple fraud. And in that case, you have a state law claim that is not interfered with by, that does not interfere with the tariff. It doesn't call for an evaluation of the terms of the tariff. Are you arguing then, counsel, that NOS has an obligation to give you the same terms that you had from your prior carrier? No. That's not exactly it. I mean, it's more like. What are you arguing? Well, they had an obligation not to deceive us. Okay. Let me give you a hypothetical. Let's suppose, let's suppose that NOS says we'll give you, that you're paying 10 cents a minute with your current carrier. NOS says we'll give you 2 cents a minute. And it turns out that what you really get is 5 cents a minute. So the terms that you're getting with NOS are better than what you had with your previous carrier, but not as good as promised. Exactly. You got no measured damages there? You don't under the Seventh Circuit's rendition of what the Savings Clause preserves. You don't. No damages. Whereas you do, you would have a claim if you could bring a breach of contract claim, right? The claim that is preempted would have damages, but it's preempted. So you admit that under that one, then, that you have no damages. Right. So the only case in which you would have damages is if you are worse off with NOS than you are with your present carrier, even though NOS has promised you something better. That's right. And the reason why, you know, I wanted to point out to a more recent case of the Seventh Circuit where this is discussed again. And it's a case concerning this defendant, and it's a case concerning this practice out of the Seventh Circuit. It's Dreamscape versus Affinity. And it's at ‑‑ You can cite that on a separate sheet, and it will be given to us. I take it it wasn't cited in the briefs. Right. It came out last summer. And in that case, the Seventh Circuit did dismiss on the grounds of preemption by specifically noting the Conman distinction for nondisclosure cases and the Sixth Circuit's decision that was cited in Conman and saying that's not the case here because here, Dreamscape, the plaintiff, is seeking to enforce the rate that was promised, whereas in those other cases, the measure of damages was measured by rescission, by going back to what the plaintiff was paying in their ‑‑ to their previous carrier. That would be okay. But that's not the case here because this plaintiff is not seeking that. And that, Your Honors, that is the only way that this savings clause can be given any meaning whatsoever under the FCA, is to preserve something of that nature. Thank you, counsel. Good morning, Your Honors. Joe Boyle from the law firm of Kelly, Dry and Warren on behalf of the defendant appellees. I'll address the Federal issues first in the order that they were presented. The fact of the matter is that nobody argues that there isn't a private right of action under the FCA pursuant to 206 and 207. However, that private right of action is to either enforce the terms of a tariff or to argue that I've been charged something that's not in the tariff. And, of course, that's the Evans case and the Brown case from the circuit. What is not allowed is what the FCA claims here seek, which is to go in and challenge the terms of the tariff and seek damages because of what is in that filed tariff. Well, I understand it just a little bit differently. They're not challenging the tariff. NOS can charge whatever they want. Their arguing is that they were induced to change carriers because you have misrepresented what your tariff actually is. And as I understood, Counsel, just a minute ago, to give away the case where he switches carriers and comes to NOS and gets a better rate than he had but not as good as promised. And he said, I don't have a measure of damages there. I got a better rate with NOS. It's just that you guys lied to me anyway. Well, Your Honor, I draw a distinction. I think what Counsel is addressing, too, is the state law claims, not the FCA claims. The Federal Communication Act claims here do challenge the terms of the tariff. They go directly to the heart of the tariff. They contend that it's confusing, it's misleading. They want the court, the district court, to take the tariff and actually judge whether or not it meets the standards under the Federal Communications Act. And we have argued, and I don't think there is a case to the opposite that says that that is a non-justiciable issue. That is an issue that has been reserved to the FCC. They can make a complaint to the FCC, and the FCC can award damages. The FCC typically does not award class damages, but they can award individual damages. And then, if they don't get the relief they want, their right is an appeal to an Article III appellate-level court. But they cannot go to court, to a district court judge, hand them the tariff, and say this was filed at the FCC. We don't like the terms of it. We think it's unfair, and we want you to award us damages based upon your view of whether or not this is fair or not. That is clearly not allowed. There is not a case out there that provides that. DAVL, which was recently cited and I think submitted to the court yesterday by the appellants, is a case under 276 of the Federal Communications Act that has to do with payphone service providers. Under the Act, payphone service providers finally, in 1996, got the right to receive reimbursement for dial-around calls when you use your 800 number instead of putting a coin in the phone. And so 276 said these payphone service providers should be paid. And then there was a rulemaking, and the rulemaking said they should be paid. Well, they weren't getting paid, so they sued. And there was a question before the Ninth Circuit, can they sue for this and recover these sums? And the Ninth Circuit said yes, but that is a very specific issue. It has to do with the rate for payphone service providers. It is not the generalized nature of damages and a claim that's sought here. Tell me if I've got this right. I think what you just said covers my hypothetical where the tariff says $0.04 a minute and the company programs its computers to charge $0.06 a minute. You're saying in that case there is a federal private right of action for the $0.02. No, Your Honor, there is not. Because the presumed knowledge doctrine, and I understand that, you know, this is a harsh doctrine, but the courts that have passed on it have noted its harsh application. I didn't raise the advertising hypo, you understand. The company, the tariff says $0.04. Oh, I'm sorry. You're absolutely right. The company advertises $0.04, and they charge $0.06. You're absolutely right. That claim, there is a private right of action for that claim. There is. So there could be a federal class action for the $0.02. Yes. You could go in and say your tariff doesn't say you can charge me $0.06, and you charged me $0.06. So you're actually violating the filed tariff doctrine because you're not charging in accordance with your tariff. The reason you can do that is because that's enforcement of the tariff, of the published tariff. Exactly. But then in my other hypo where the tariff says $0.06 and they advertise $0.04, there cannot be a private right of action for the $0.02 obtained by fraud because in common law you'd say there's no reasonable reliance because they could look at the tariff. And then at telephone law we say it's not justiciable because of the published tariff. And it's also, you know, it would also be barred by the presumed knowledge doctrine because you wouldn't have reasonably ruled out. There's no reasonable reliance, I think. Exactly. Exactly. And, Judge Bybee, to get to your point about the restitution issue, and that was actually brought up by the Seventh Circuit in Dreamscape. I argued that case. And the interesting thing about that is, first of all, it's not a restitution theory that these plaintiffs can proceed upon because a restitution theory requires restoration to the status quo ante. So what would be required is that they would have to seek a claim where they said, our measure of damages is the rate that we thought we were getting minus the value of the service you provided to us because you have to restore the parties to the status quo ante. So in that situation, the court would actually have to do some rate setting because the court, in order to have a proper damage claim, would have to value NOS's service in order to figure out how to restore the parties to the status quo ante. Well, if I understood, if you, if they were getting 5 cents with their previous carrier and you advertised, come with us and you get 2 cents, and it turned out that your published rate was actually 10 cents, their measure of damages would not be the benefit of the bargain, which would be the difference between 10 cents as charged and 2 cents as advertised, which would be 8 cents, but actually between what they were previously being charged by their prior carrier, which was 5 cents, and the 10 cents that you're now charging. In other words, they're worse off. You lied to them. They just want to get back to where they were before. Well, Your Honor, I think, quite frankly, the entire claim, regardless of the measure of damages, is actually barred under both the non-justiciability and the nondiscrimination strand of the doctrine because ultimately, no matter how you slice it, the court is going to have to engage in rate setting. At some point in time, they're going to get a rate different than the rate that NOS has in its published tariff. You might, I mean, at some point, we might want to say, gosh, maybe we should just let you out of your contracts, let you go back to whatever carrier you want to go to, but in the meantime, you've been induced by false advertising to come with us, and we're going to give you a lump sum. It's not a tariff. It's not a rebate on your, it's not credit towards your future phone bills. It's just money. But it is going to be measured against the tariff that you paid to your prior carrier and the tariff that you're paying with us. But in effect, and interesting, Marcus talks about the effect, and so does Streamscape. You have to look at the effect of what is being done, not just the title of how the damage claim is styled. In effect, no matter what happens, that customer gets a different rate than the rate in NOS's non-discrimination strand, because that litigating plaintiff gets a different rate than the non-litigating rate payer at NOS, and that is barred by the non-discrimination strand of the filed tariff doctrine. As a matter of sort of economics, where money is fungible, I think your argument is quite correct. So how do we, what remedy do people have when they've been lied to? Well, obviously on the merits, we could test if there was any false and misleading statements. But for example, they have made much of the notice of apparent liability before the FCC. There were complaints made by customers. The FCC undertook to look at it, and interestingly, the FCC did not say total call units are per se illegal, get them out of here. They said, we've looked at your advertising, we've looked at your solicitation materials, we want them to be better. So we entered into a consent decree, improved our solicitation materials, and agreed upon an amount to pay. No admission of liability. Now, each of those customers was, I believe all of those 900 complaints were informal complaints. There were letters and the like. They were free to file a formal complaint, go before the FCC, and seek damages. And that's clearly what the case law provides. Let me ask the same question I asked the other counsel. Would they have had a remedy at the FTC? Well, it's a very interesting point because of the dissent in the NAL by the commissioner was concerned about this jurisdictional divide over advertising in the telecommunications industry. Because the FCC has such broad authority in the telecommunications industry that one could It would be a curious battle between the FTC and the FTC over that question. But it also raises an interesting point because if the FTC can assert jurisdiction here, I'm sure that the FTC's jurisdiction is exclusive. And that it isn't in addition to state remedies. Or, alternatively, that the FTC action, when actually brought, might preempt state activities, but otherwise wouldn't. Well, and I understand that, but I still think that that would be almost a level of bootstrapping because at the end of the day, you're still going to have to go to the litigating customer and give them a rate different than the non-litigating customer. I wonder if I've been confused now by some of your answers to Judge Bybee's questions. I thought it was clear that if the telephone company has a published tariff and it plainly says $0.04 a minute, and they just flat out lie, the plainest, most intentional, willful, fraudulent lies, and they say it's only going to be $0.02 a minute, that these doctrines that have special names, not justiciable, presumed knowledge, and so forth, no discrimination, mean the customer has no remedy. Yes. I believe, Your Honor, they could bring a complaint before the FCC complaining about the practice that is indicated. Non-justiciability — They could not get their $0.02. Well, I don't — honestly, I don't know what remedy the FCC would approve. I believe the FCC would say you cannot get your $0.02 because that's barred by the filed tariff doctrine, and it amounts to retroactive rate making. There is authority within the FCC that says under no circumstance will they engage in retroactive rate making. That is what I thought. Yes. Now, let me ask you about something else. Let's suppose, hypothetically, that the tariff really is incomprehensible. It combines the use of poorly defined terms of art and abbreviations in such a way as to be indeterminate. Careful examination would not yield one unambiguous rate for a particular type of call. Is there a remedy for the customer? Where is the remedy, and what is the remedy? Well, there's a remedy. I mean, under 204 of the Act, the FCC can undertake to examine a tariff, and they can suspend this operation. And there are actual, I believe there are cases where complaints are made about. You're not going to go to enough trouble because you're mad about the $18 you can get the FCC to take some kind of administrative action. Yes. But you won't get your $18. Well, what happens, as I understand it, at the FCC is they can suspend the tariff. They can then institute proceedings, and I believe that their view is if the tariff is suspended, we can award damages for the period from the suspension of the tariff going forward because we're not engaging in retroactive rate making. We've suspended the tariff. You don't have a rate on file. But there is a tremendous weight, there's a tremendous lack. The FCC does not like to engage in retroactive rate making. They don't do it. They don't even do it when complaints are made. The fact of the matter is, as in most regulated industries, the FCC has the jurisdiction to look at the tariff. They could knock it out of the box when it's filed. Okay. You've taken me far enough. I understand what you said. It's very clear. Now, let me ask you my next question. As far as I can tell, the law is clear. There is no money remedy for fraud by a long-distance telephone carrier. I'm trying to figure out what's left of the savings clause, which is just the opposite. It's just the opposite of a preemption clause like in ERISA. It says nothing in this chapter abridges remedies in common law or by statute. And the provisions of this chapter are in addition to such remedies. So it saves them all instead of preempting them. What's left if there is just no money remedy for fraud? Well, this was addressed by the central office case. The first thing the central office case said is that it couldn't act to save otherwise preempted claims because otherwise 414 would kill the act. It would kill itself. I believe it is Justice Scalia in his concurrence who posits the hypothetical. A carrier has a relationship with a customer, and then not anything to do with what's in the filed tariff goes out to one of the customer's customers and defames the customer. It says they offer terrible service. They're rotten. Don't use them. And there's a defamation act claim brought. That would not be preempted. Importantly here, because the counsel that addressed the State law claims ---- I think it would be nice if you saved a little time to talk about Sound Travel's argument. Your Honor, with respect to ---- Well, Your Honor, Judge Posner and Kahneman, I disagree with the reading that Plaintiff's Counsel has of Judge Kahneman's argument. Judge Kahneman did have some State Fraud Act claims. And at the end of his opinion, he indicated if the State Fraud Act claim is really just a breach of contract claim by another name, it, too, would be preempted. And I think I have the excerpt of the opinion. It says ---- Reading from what page? Give us a page. Sorry. It's ---- I have the page 9 of the printout. Let me see if I can find what ---- I think it's 490. Okay. It says, it seems, then, that in this case, fraud is just another name for breach of contract. That was in this case. In this case? Well, Posner says, in this case. Right. So he's not saying in all cases. Right. But when you talk about what these plaintiffs are looking for here, for example, in page 2 of their opening brief, plaintiffs note the Fisher Sound Travel and National Foods allege State law claims regarding the rates and services offered by NOS. It's very clear that what's happening here is, no matter how you slice it, they want a different rate. They receive telecommunications services at X rate. They want ---- they really want to get it at Y rate. That's a contract. I mean, they're saying there was fraud in the inducement, as Judge Bybee indicated. But what they're ---- what you're really looking at is a customer-carrier relationship with a component in it of a payment of money. They paid a certain amount of money in that customer-carrier relationship, and they want to pay less. And I think in that case, just as in Kahneman, it's really ---- it's basically a contract measure of damages. Well, Kahneman does say that it separates out the state fraud claims. Are you saying that there's no state fraud claim that's going to survive? In this case or in Kahneman? From Kahneman's discussion. I don't believe that there is a state law case for money jet damages that can survive the file tariff doctrine. And I don't ---- Even for fraud? Even for fraud. And the basis of that is the case you rely on mostly for that is? Well, certainly we rely on the Marcus case. We rely on Kahneman. And I believe, I think it is maybe even an endowment, that there is no general fraud exception to the file tariff doctrine. I mean ---- The thing about relying on Kahneman is it wasn't like the fraud hypo that I gave you. In Kahneman, they advertised free Fridays to any country in the world, and the tariff really provided for free Friday calls to any country in the world, and the customers got free Friday calls to any country in the world. Then the company filed a new tariff. The advertising had been, you get this for a year, but the new tariff was filed in, I think, four months or something. And under the new tariff, some countries are excluded. Ten countries are excluded. So the people now are not getting what they were promised, but they are getting exactly what the tariff says. If the fraud was in charging them something different from the tariff, then it would be preserved under Kahneman. I don't believe so, Your Honor. I think that at the end of the day, if you look at every one of these cases, including in central office, the whole argument that the plaintiffs posit is, I was told X. I didn't get X. Well, what you're saying is that in Kahneman, they said any fraud case ends up like a contract case. Exactly. And the reason for it. But is that true with a state fraud case that just wants to set aside everything? Rescind the entire relationship? I believe so, Your Honor, because ultimately, first of all, obviously, if it's fraud and the inducement, the plaintiff has two options. One is to seek rescission. The other is to affirm the contract and seek fraud-based damages on the contract, which is effectively what these plaintiffs have done, because they want a different rate. They are not, as I said before, seeking classic rescission, which is you give me everything back I paid, and I'll give you the value of the service on some quantum Merowith basis so we're restored to the status quo ante. That's not in any of the complaints. It's not a claim for relief that's been sought. What they have done is they want to affirm the relationship and then say, as my measure of damages, I want my old carrier's rate. That's a classic contract-type analysis. Counselor, our time is running short. I want to ask one question following up on something else that you told Judge Wallace. If I heard you correctly just a minute ago talking about the AT&T case, I think you were referring to Chief Justice Rehnquist's concurrence. Scalia, I think, wrote to you. Oh, I'm sorry. Yes. And Scalia uses the, or Rehnquist uses the tort case. Are you suggesting then that no contract cases survive the filed rate doctrine? You made an absolute statement that no state law claim survived the filed rate doctrine. That seemed to be inconsistent with what you earlier said, that it actually needed defamation. So that would be, are you drawing a tort claim, a tort contract distinction? I apologize if the language I used was too broad. But if we focus on the customer-carrier relationship, you know, the core of the relationship between the parties, I signed up, I get service, I pay you a rate, there is no claim that seeks damage to adjust the terms of that relationship, be it under contract or fraud. No claim survives that. They are, the central office says they're preempted and they're barred. Those savings, what the savings clause saves only would be some kind of tort, some kind of claim in tort, such as a defamation. Right. Something that goes beyond the quintessential customer-carrier relationship, the customer being required to pay money, the carrier being required to provide a telecommunications service. If the carrier goes outside that relationship and takes some adverse action against the customer, such as defamation, that would survive. And I believe that that's the example that was used. So there, you know, it's not to say that the FCA would define every aspect of every time you had a relationship at all. Don't you just look at the effect of whatever the challenge is and see whether the effect is to challenge the tariff? That is exactly correct. It is the effect of the remedy sought. Once you see that the effect of the remedy sought is to adjust the rate that the otherwise the terms of service between the carrier and the customer, that claim is barred by the filed tariff. What if it's not an attempt to challenge the tariff? It's to obtain damages in tort for inducing the plaintiff to agree to that tariff. I go back to your effects test. What is the effect of that? The effect of that is that customer pays less than the filed rate. No matter what anybody says, at the end of the day, once you adjust out the rate they were charged under the tariff minus the amount they recovered, you have a new rate, and that rate is not the filed rate. Thank you, Counsel. Thank you. Counsel. Thank you, Your Honors. On the federal claims, I just want to be very clear that I believe DAVL does exactly what a private claim for right of action from 207 to apply a 201 claim for violation of 201 under the Act, and it says at page 1086, this is so even though the lawsuit in effect challenges the tariffs on file between 1997 and 2002 and, if successful, would result in DAVL paying an amount for public access time services different from that provided in the tariffs. And that's exactly what we do here in the Supreme Court case that the Ninth Circuit relied on in DAVL is the Reiter case, and it's cited therein. And in Reiter, which was an ICC case applying similar standards, it said, Respondents contend that the doctrine of primary jurisdiction requires petitioners initially to submit reasonable rate claims to the ICC rather than to a court. That reflects a mistaken understanding of primary jurisdiction. Counsel, I'm with you, frankly, on all the abstract statements, and I'm still having trouble with the concrete. Let me explain what I mean. If the telephone company truck runs over my dog, I think I can recover damages for killing my dog, even though the net effect is that I pay the telephone company less when you consider what they pay me for the dog than their published tariff. It's a totally independent tort, and even though it means I pay the phone company less than the tariff, in our overall relationship, I win. But I can't figure out what your claim is other than the tariff is incomprehensible, we're fooled into agreeing to it, and we should not be paying rates under this tariff. Right. And, Your Honor, let me help you with that a little bit. In the Halperin case, which was an FCC case, but it provides the guidance that this court needs and any court would need in interpreting the terms of the tariff. It's cited in our briefs, and it is a case in which MCI had what they called a pre-subscribed rate, and they charged you nine subscriber charges. Terms of common usage, and the point is to have the court here interpret the tariff as you would any contract. What are the expectations of the parties? In the MCI case, the expectations of the parties were such that when you dialed one plus the number, you went through your pre-subscribed carrier. Pre-subscribed and non-subscribed are inherently inconsistent terms. They don't make sense. The FCC invalidated that provision of the tariff, and there is a damage remedy for that. And all we're saying is that this court, under these authorities, has the obligation under Section 207 plain language to consider that in the first instance and let us make that case in court. And when we make that case, then you will understand it better because we'll have a set of facts to bring back to you, and the rule that the court applied here dismisses it. It's set out in very abstract terms in the complaints. Tell me exactly what the case is. Our case? It's that the tariff is unreasonable because it uses terms that are commonly understood by users of the service, cents per minute and cents per minute of usage, in a way that's inconsistent with the expectations of those parties. And it does that in order to apply a rate that is higher than what those customers would expect. Typical contract analysis. And the tariff is designed to do that. And in that sense, it's unjust and unreasonable, which violates Section 201. Let's say the tariff says your charge will be three cents a minute. And then in another provision of the published tariff, it says the word minute is used in this tariff means 30 seconds. Right. It does that in a much more complicated way. That's exactly what it does. Why wouldn't the tariff nevertheless be binding? It's perfectly determinate. You're going to pay six cents a minute, not three, for what normal humans would regard as a minute, people that spoke English. But the tariff plainly says that they're using the word minute to mean 30 seconds, and the FCC approved it. Nobody filed a timely administrative challenge. That's that. Well, the FCC approval means nothing because it's on a quick approval process. And according to the FCC, it examines the reasonableness at any time that a challenge is raised. So the fact that it got filed means nothing. The fact that it takes a term that's commonly understood and uses it in a different way is exactly what Halprin says makes it an invalid term of the tariff. And Halprin, Section 201, says that's a violation of the Federal Communications Act, and you get damages. And you're entitled to bring that in court under Section 207 by its plain language. We're not asking for anything more than that. And that's the simple case, Your Honor. Thank you, Counsel. Your Honors, returning to the state law claims, Mr. Boyle, for the companies, indicated that there is no fraud claim that a customer can bring against a carrier under the file tariff doctrine. And I believe in response to your question, Judge Wallace, he said that Kahneman supports that. And Kahneman does not support that. It says the opposite. Kahneman says that there is a fraud claim that you can bring against a carrier for misrepresentation. And Judge Posner called it simple fraud, and he referred to the Sixth Circuit decision that embraced that approach. What page is that on Kahneman? In Kahneman, it's page 488. And that's exactly the passage from Kahneman that the Court then discussed in Dreamscape last year, which I'll provide the site for that after the argument. So that is the area, the very small sliver, that the cases, that these circuit cases, have permitted to be embraced by the Congress's very broadly worded savings clause. And counsel for ---- Hold on. I'm still looking at page 488 of Kahneman to find what you said. I don't see what you mean. All right. It suggests that the savings clause, interpreted literally, would permit a state law breach of contract suit to impair the Act. Right, and it goes on to say that can't be because we've held and the Supreme Court has held that the Act cannot be interpreted to destroy itself, and that's what would happen. Then it goes on to say, well, it must mean something. And the sentence beginning, such a procedure bypassing the FCC, cannot have been the sort of thing intended by the savings provision, the proper operation of which is illustrated by in-ray long distance telecommunications litigation, 831 at second, 627 at 633 to 34. And shall I read it, continue reading? What was the measure of damages in that Sixth Circuit case? Well, to tell you the truth, that's a great question because, in fact, the Sixth Circuit was not concerned with this very fine distinction we've been trying to discuss today between a measure of damages based on essentially the contract measure, what I was promised, versus the measure of damages based on the inducement, the rescission, where I was when I got misled. The Sixth Circuit didn't make that distinction. It looked at the Nader case from the Supreme Court, which involved Ralph Nader's claim that he got bumped and he should have been told that he would get bumped. And the Supreme Court said that's not, doesn't have to, you know, disclosure claims don't have to, don't threaten uniformity or implicate expertise of an agency, and so they can go forward. But the Seventh Circuit has subsequently, not only in Kahneman, but again in Dreamscape, and I think a district court case also involving NOS Communications did the same thing, has identified this distinction between how you're measuring damages and has said, you know, if the plaintiff is seeking benefit of the bargain damages, then that challenges the terms of the tariff, but if not, then it doesn't. Would your clients be satisfied with rescission here? Well, yeah, I think that's exactly what we're seeking. Do they really want monetary damages? Well, I'm not sure. I think that rescission, to tell you the honest truth, Your Honor, I'm not sure what rescission would entail in terms of a remedy because this happened in 1999, and they've, you know, wrestled with these companies for several months or years and finally got rid of them, and, you know, that's where we are today. And I think that the damages for rescission would be, as discussed, that they would be measured by where we would have been if we hadn't been misled. I thought you don't get damages for rescission. You get damages for breach of contract, and the contract is the tariff. You get damages for fraud. Again, I'll have to return to my confession that I do not know exactly how a rescission remedy, what it looks like in practice, but I thought that's what we were looking for, and I thought that's what the Seventh Circuit said we're talking about here. The claims in central office that were actually made in central office and in Kahneman were qualitatively different than the claims being made here in the sense that those people were seeking the benefit of the bargain, the promise made, and that's what the court said was not permissible under the Filed Rate Doctrine. Counsel tried to make a distinction between some sort of tort that you might have against your carrier that has nothing to do with the rates you pay and the torts that have some bearing on rates. And I would submit that that's really unrealistic and not a plausible reading of what Congress intended when they wrote the Savings Clause, which says this shall not abridge in any way any rights, because how many carriers would, how many such claims would ever exist? You're over, incidentally. Oh, I'm sorry, Your Honor. There was one thing I wanted to mention about the Presumed Knowledge Doctrine. One sentence. Thank you. It's not, it's a creature of the Filed Rate Doctrine, and if the Filed Rate Doctrine doesn't apply to a particular type of claim, then nor should the Presumed Knowledge Doctrine. And as Marcus and Gelb said, a widespread fraud would not be covered by the Presumed Knowledge Doctrine. Thank you. Thank you. Fisher v. NOS Communications is submitted.
judges: Wallace, Kleinfeld, Bybee